UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

MICHAEL SAMUELS,

          Plaintiff,

    v.

COMMISSIONER OF SOCIAL
SECURITY,[1]

          Defendant.

Case No.18-cv-01872-VKD

**ORDER RE CROSS-MOTIONS FOR
SUMMARY JUDGMENT**

Re: Dkt. Nos. 20, 30

Plaintiff Michael Samuels appeals a final decision by defendant Commissioner of Social Security ("Commissioner") denying his application for supplemental security income ("SSI") under Title XVI of the Social Security Act ("Act"), 42 U.S.C. § 1381, *et seq*. The parties filed cross-motions for summary judgment. Dkt. Nos. 20, 30. Pursuant to the Court's order (Dkt. No. 19), each side also submitted statements of the administrative record. Dkt. Nos. 21, 31, 35. The matter was submitted without oral argument. Upon consideration of the moving and responding papers, the relevant evidence of record, and for the reasons set forth below, Mr. Samuel's motion for summary judgment is granted in part and denied in part, the Commissioner's cross-motion for summary judgment is granted in part and denied in part, and this matter is remanded for further proceedings consistent with this order.[2]

---

[1] Pursuant to Fed. R. Civ. P. 25(d), Andrew M. Saul is now the Commissioner of Social Security and is substituted in place of Nancy A. Berryhill.

[2] All parties have expressly consented that all proceedings in this matter may be heard and finally adjudicated by a magistrate judge. 28 U.S.C. § 636(c); Fed. R. Civ. P. 73.

# I.     STANDARD FOR DETERMINING DISABILITY

A claimant is considered disabled under the Act if he meets two requirements. First, a claimant must demonstrate an inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). Second, the impairment must be so severe that a claimant is unable to do previous work, and cannot "engage in any other kind of substantial gainful work which exists in the national economy," considering the claimant's age, education, and work experience. *Id*. § 1382c(a)(3)(B).

In determining whether a claimant has a disability within the meaning of the Act, an ALJ follows a five-step sequential analysis:

At step one, the ALJ determines whether the claimant is engaged in "substantial gainful activity." 20 C.F.R. § 416.920(a)(4)(i). If so, the claimant is not disabled. If not, the analysis proceeds to step two.

At step two, the ALJ assesses the medical severity of the claimant's impairments. 20 C.F.R. § 416.920(a)(4)(ii). An impairment is "severe" if it "significantly limits [a claimant's] physical or mental ability to do basic work activities." *Id*. § 416.920(c). If the claimant has a severe medically determinable physical or mental impairment, or a combination of impairments, that is expected to last at least 12 continuous months, 20 C.F.R. § 416.920(d), he is disabled. *Id*. § 416.920(a)(4)(ii). Otherwise, the evaluation proceeds to step three.

At step three, the ALJ determines whether the claimant's impairments or combination of impairments meets or medically equals the requirements of the Commissioner's Listing of Impairments. 20 C.F.R. § 416.920(a)(4)(iii). If so, a conclusive presumption of disability applies. If not, the analysis proceeds to step four.

At step four, the ALJ determines whether the claimant has the residual functional capacity ("RFC") to perform his past work despite his limitations. 20 C.F.R. § 416.920(a)(4)(iv). If the claimant can still perform past work, then he is not disabled. If the claimant cannot perform his past work, then the evaluation proceeds to step five.

1   At the fifth and final step, the ALJ must determine whether the claimant can make an

2   adjustment to other work, considering the claimant's RFC, age, education, and work experience.

3   20 C.F.R. § 416.920(a)(4)(v).  If so, the claimant is not disabled.

4   The claimant bears the burden of proof at steps one through four.  The Commissioner has

5   the burden at step five.  *Bustamante v. Massanari*, 262 F.3d 949, 953-54 (9th Cir. 2001).

6   **II.     BACKGROUND**

7   Mr. Samuels was born in 1965 and was 50 years old at the time the ALJ rendered the

8   decision under consideration here.  He has a high school education and a limited work history.  On

9   December 6, 2013, Mr. Samuels applied for SSI, alleging an inability to work as of December 6,

10  2013[3] due to post-traumatic stress disorder, schizophrenia, a growth in his chest, and a history of

11  drug use.  AR[4] 220.  The record also indicates that Mr. Samuels had a stent placed following a

12  heart attack in December 2014.  *Id*. at 486, 704-904.  His application was denied initially and upon

13  reconsideration, and Mr. Samuels requested a hearing before an ALJ.

14  ALJ David Mazzi held a hearing on April 18, 2016, at which Mr. Samuels appeared and

15  testified.  *Id*. at 43-59.  Although a vocational expert ("VE") was present, he did not testify.  The

16  record was held open following that hearing.  *Id*. at 27.  At the ALJ's request, consultative

17  examiner Dr. Faith Tobias, Ph.D. evaluated Mr. Samuels on June 22, 2016.  Additional records

18  were submitted, and a second hearing was held on August 22, 2016.  *Id*. at 27, 60-66, 303-304,

19  306.  Mr. Samuels appeared and testified at the August 22 hearing.  *Id*. at 60-66.  Although a VE

20  was also present at this second hearing, she did not testify.  *Id*.

21  On September 16, 2016, the ALJ issued a decision concluding that Mr. Samuels is not

22  disabled under the Act.  *Id*. at 27-37.  At step one of the sequential analysis, the ALJ found that

23  Mr. Samuels had not engaged in substantial gainful activity since the alleged onset date of

24  December 6, 2013.  *Id*. at 29.  At step two, the ALJ found that Mr. Samuels has the following

25  severe impairments:  emphysema, coronary artery disease, affective disorders, and schizophrenia.

26

27  [3] Although Mr. Samuels originally alleged an onset date of December 12, 1995, he subsequently amended that date to December 6, 2013, the date of his SSI application.  AR 27, 47, 220.

28  [4] "AR" refers to the certified administrative record lodged with the Court.  Dkt. No. 16.

*Id.*; 20 C.F.R. § 416.920(c). However, at step three, the ALJ concluded that Mr. Samuels does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R., Part 404, Subpart P, Appendix 1, 20 C.F.R. §§ 416.920(d), 416.925, 416.926. AR 30. The ALJ determined that Mr. Samuels has the RFC to perform light work, as defined in 20 C.F.R. § 416.967(b), subject to the limitation that he would need to avoid concentrated exposure to respiratory irritants and is restricted to simple, routine tasks equating to unskilled work. *Id.* at 32. At step four of the sequential analysis, the ALJ found that Mr. Samuels has no past relevant work and that transferability of job skills is not an issue. *Id.* at 36. At step five, the ALJ looked to the Medical-Vocational Guidelines, 20 C.F.R., Part 404, Subpt. P, App. 2, commonly referred to as "the grids," and concluded that there are jobs that exist in significant numbers in the national economy that Mr. Samuels can perform. *Id.* at 36.

The Appeals Council denied Mr. Samuel's request for review, and the ALJ's decision became the final decision of the Commissioner. *Id.* at 1-11.

Mr. Samuels now seeks judicial review of that decision, arguing that the ALJ erred in five respects. First, he contends that the ALJ improperly rejected the opinions of his treating psychiatrist, William Mains, M.D., as well as portions of Dr. Tobias's assessment without providing sufficient reasons supported by substantial evidence. Second, Mr. Samuels argues that the ALJ failed to provide specific, clear, or convincing reasons for discounting Mr. Samuels's testimony. Third, Mr. Samuels argues that the ALJ's RFC assessment failed to take all of his limitations into account. Fourth, Mr. Samuels contends that the ALJ's finding at step five, that there are other jobs he can perform, is not supported by substantial evidence because the ALJ did not receive any testimony from a VE. Fifth, Mr. Samuels argues that the ALJ's decision is invalid, and requires remand, because the ALJ was not properly appointed under the Appointments Clause of the U.S. Constitution. The Commissioner contends that the ALJ's decision is correct and free of legal error and that Mr. Samuels has forfeited any challenge to the ALJ's appointment.

### III.    LEGAL STANDARD

Pursuant to 42 U.S.C. § 405(g), this Court has the authority to review the Commissioner's decision to deny benefits. The Commissioner's decision will be disturbed only if it is not supported by substantial evidence or if it is based upon the application of improper legal standards. *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 599 (9th Cir. 1999); *Moncada v. Chater*, 60 F.3d 521, 523 (9th Cir. 1995). In this context, the term "substantial evidence" means "more than a mere scintilla but less than a preponderance—it is such relevant evidence that a reasonable mind might accept as adequate to support the conclusion." *Moncada*, 60 F.3d at 523; *see also Drouin v. Sullivan*, 966 F.2d 1255, 1257 (9th Cir. 1992). When determining whether substantial evidence exists to support the Commissioner's decision, the Court examines the administrative record as a whole, considering adverse as well as supporting evidence. *Drouin*, 966 F.2d at 1257*; Hammock v. Bowen*, 879 F.2d 498, 501 (9th Cir. 1989). Where evidence exists to support more than one rational interpretation, the Court must defer to the decision of the Commissioner. *Moncada*, 60 F.3d at 523; *Drouin*, 966 F.2d at 1258.

### IV.    DISCUSSION

#### A.    Appointments Clause Challenge

Because Mr. Samuels's fifth issue implicates the validity of the underlying administrative proceeding, the Court addresses that matter first. Mr. Samuels argues that under *Lucia v. Securities and Exchange Comm'n*, 138 S. Ct. 2044 (2018), ALJ Mazzi was not properly appointed under the U.S. Constitution and therefore lacked authority to hear and decide his case. In *Lucia*, the Supreme Court held that ALJs of the Securities and Exchange Commission ("SEC") are "'Officers of the United States,' subject to the Appointments Clause" of the U.S. Constitution, which prescribes that such "Officers" may be appointed only by the President, a court of law, or a head of department. *Id*. at 2051, 2055. Therefore, the ALJ at issue in *Lucia*, who had been retained by SEC staff, was not properly appointed by the SEC.[5] *Lucia*, 138 S. Ct. at 2055. Where

---

[5] The Supreme Court noted a distinction between "principal" and "inferior" officers: "Only the President, with the advice and consent of the Senate, can appoint a principal officer; but Congress (instead of relying on that method) may authorize the President alone, a court, or a department head to appoint an inferior officer." *Lucia*, 138 S. Ct. at 2051 n.3. That distinction was not at issue in *Lucia* because the parties agreed that the SEC's ALJs are inferior officers that could be

such constitutional challenges are timely made, the appropriate remedy is to provide a new hearing before a different ALJ that is properly appointed. *Lucia*, 138 S. Ct. at 2055 ("This Court has held that one who makes a *timely* challenge to the constitutional validity of the appointment of an officer who adjudicates his case is entitled to relief.") (emphasis added; internal quotations and citation omitted).

Here, Mr. Samuels argues that ALJs of the Social Security Administration ("Administration") are like those of the SEC, noting that the Administration's ALJs are appointed pursuant to 5 U.S.C. § 3105[6] and may preside over hearings, receive evidence, issue subpoenas for the appearance of parties or the production of records, and take testimony under oath, 20 C.F.R. § 404.950. While this Court does not foreclose the possibility that the Administration's ALJs may be officers of the United States subject to the Appointments Clause,[7] Mr. Samuels has not presented facts or evidence establishing that ALJ Mazzi was, in fact, not properly appointed.

Moreover, *Lucia* "only provides a remedy for *timely* challenges that were made during the administrative process." *Morrow v. Berryhill*, No. C18-04641 WHA, 2019 WL 2009303, at *4 (N.D. Cal. May 7, 2019). "While the Ninth Circuit has not directly spoken on the issue of preserving challenges under *Lucia* in the social security context, it has confirmed the general proposition that a social security claimant must exhaust issues before the ALJ to preserve judicial review." *Camilli v. Berryhill*, No. 18-cv-06322-JSC, 2019 WL 3412921, at *13 (N.D. Cal. July

---

appointed by the SEC, which "itself counts as a Head[] of Department[]." *Id*. at 2050 (internal quotations and citation omitted).

[6] That statute provides:

> Each agency shall appoint as many administrative law judges as are necessary for proceedings required to be conducted in accordance with sections 556 and 557 of this title. Administrative law judges shall be assigned to cases in rotation so far as practicable, and may not perform duties inconsistent with their duties and responsibilities as administrative law judges.

5 U.S.C. § 3105.

[7] Although the Commissioner contends that the powers of the Administration's ALJs are not coextensive with those held by those of the SEC, he also expressly "does not argue that [the Administration's] ALJs are employees rather than inferior officers." Dkt. No. 30 at 22.

29, 2019) (citing *Shaibi v. Berryhill*, 883 F.3d 1102, 1109 (9th Cir. 2017)).  Indeed, district courts, including those within this district, have declined to remand a matter when the claimant's Appointments Clause challenge was not raised during the administrative proceedings.  *See, e.g., Camili*, 2019 WL 3412921 at *13 (concluding that the plaintiff forfeited her Appointments Clause challenge where that claim was not made during the administrative proceedings); *Morrow*, 2019 WL 2009303 at *4 (same, noting that "nearly all district courts that have faced this issue have declined to remand when the Appointments Clause challenge was not exhausted during the administrative process."); *Allen v. Berryhill*, No. 17-cv-03414-HSG, 2019 WL 1438845 at *13 (N.D. Cal. Mar. 31, 2019) (same).  Here, the Commissioner argues that Mr. Samuels forfeited his Appointments Clause challenge because he did not raise it during the administrative proceedings.

Mr. Samuels did not reply to the Commissioner's argument.  Nor did he directly address the forfeiture issue in his moving papers.  In his opening brief, Mr. Samuels merely cites parenthetically to *Jones Bros. v. Sec'y of Labor*, 898 F.3d 669 (6th Cir. 2018), a case that concerned an Appointments Clause challenge to an ALJ of the Federal Mine Safety and Health Review Commission.  In *Jones Bros.*, the Sixth Circuit found that the claimant forfeited his Appointments Clause challenge by failing to raise it during the administrative proceedings, but nonetheless concluded that specific provisions of the Mine Act excused the forfeiture of the claim. *Id*. at 677-78.  Applying *Lucia*, the Sixth Circuit concluded that the ALJ in question was not properly appointed, thus requiring remand for a new hearing with a properly appointed ALJ.  *Id*. at 679.  The analysis in *Jones Bros.*, however, turns upon the particular statutory provisions of the Mine Act.  Mr. Samuels fails to offer any argument or even discuss why *Jones Bros.*, which is not binding on this Court, extends to ALJ Mazzi in the present Social Security context.

In his reply brief, Mr. Samuels makes a passing reference to *Sims v. Apfel*, 530 U.S. 103 (2000), noting that "[a] claimant seeking judicial review does not waive any issues that were not raised before the Appeals Council."  Dkt. No. 34 at 1.  As discussed, however, Mr. Samuels does not deny that he did not raise the Appointments Clause issue at any time during the underlying administrative proceedings.  Any such challenge would seem to require the presentation of additional facts and evidence that were never presented below.  In similar circumstances, courts

have rejected the argument that *Sims* permits a plaintiff to challenge the ALJ's appointment for the first time in proceedings before the District Court. *See, e.g., Camili*, 2019 WL 3412921 at *13; *Allen*, 2019 WL 1438845 at *13.

On this issue, Mr. Samuels's motion for summary judgment is denied, and the Commissioner's cross-motion for summary judgment is granted.

### B.     The ALJ's Assessment of Medical Source Statements

As discussed above, the ALJ determined that Mr. Samuels has the RFC to perform light work, except that he needs to avoid concentrated exposure to respiratory irritants and is restricted to simple, routine tasks equating to unskilled work. AR 32. In reaching that conclusion, the ALJ gave "little weight" to the opinion of Mr. Samuels's treating psychiatrist, William Mains, M.D., who diagnosed Mr. Samuels with schizoaffective disorder, prescribed Risperdal and Vistaril, and opined that his impairments are disabling, independent of any drug or alcohol use. Instead, the ALJ adopted the assessment of the consultative examining psychologist, Faith Tobias, Ph.D., who questioned Dr. Mains's diagnosis and his assertion that Mr. Samuels's impairments would persist even during periods of sobriety. Dr. Tobias found that, for the most part, Mr. Samuels's work abilities are not limited, or are only mildly restricted, by his mental impairments. Mr. Samuels argues that the ALJ's RFC determination is incomplete because he did not provide sufficient reasons, supported by substantial evidence, for discounting Dr. Mains's opinion. He further contends that the ALJ improperly rejected or ignored portions of Dr. Tobias's report in which she noted that Mr. Samuels's impairments impose moderate restrictions on some of his work abilities.

### 1.     William Mains, M.D.

Dr. Mains began treating Mr. Samuels at the Telecare CHANGES clinic in early 2014. The record indicates that for the first year, Dr. Mains saw Mr. Samuels approximately once every two months, as well as several times in 2015 and in 2016. *See, e.g.*, AR 523, 525-527, 530, 567-568, 633, 666, 939-942, 963, 1076, 1078. As noted above, Dr. Mains diagnosed Mr. Samuels with schizoaffective disorder and prescribed Risperdal and Vistaril. *Id*. at 669, 1011.

On April 30, 2015, Dr. Mains completed a mental impairment questionnaire in which he noted that Mr. Samuels had an "okay response" to antipsychotic medications, "[g]ood mood

control" and "persistent psychotic symptoms." *Id.* at 669. Dr. Mains's clinical findings included disorganized, concrete thought process and auditory hallucinations. He assessed Mr. Samuels's prognosis as "Guarded." *Id.* Dr. Mains identified the following signs and symptoms of mental impairment: anhedonia; decreased energy; blunt, flat or inappropriate affect; poverty of content of speech; generalized persistent anxiety; difficulty thinking or concentrating; persistent mood or affect disturbances; seclusiveness or autistic thinking; emotional withdrawal or isolation; perceptual or thinking disturbances; hallucinations or delusions; and deeply ingrained, maladaptive behavior patterns. *Id.* at 670. With respect to functional limitations, Dr. Mains found that Mr. Samuels has mild restrictions in activities of daily living; marked limitations in maintaining concentration, persistence, or pace; and extreme difficulties in maintaining social functioning. *Id.* at 673. Dr. Mains noted that Mr. Samuels had repeated episodes of decompensation of at least two weeks duration within the last 12-month period preceding his assessment. *Id.* He also checked boxes on the assessment form indicating that Mr. Samuels has a medically documented history of chronic mental health disorders, lasting at least two years, that have caused more than a minimal limitation of ability to do any basic work activity, as well as a "[c]urrent history of 1 or more years' inability to function outside a highly supportive living arrangement with an indication of continued need for such an arrangement." *Id.*

Dr. Mains found that Mr. Samuels would miss at least five days of work per month due to his impairments and would be "off-task" or precluded from performing a job more than 30% of the time during an eight-hour day, five days per week. *Id.* at 674. Dr. Mains further stated that Mr. Samuels's impairments could be expected to last at least 12 months. *Id.* Although he noted that Mr. Samuels (who has a history of drug use) was not currently abusing alcohol or drugs, Dr. Mains stated that Mr. Samuels's impairments would still be disabling independent of any drug or alcohol use. *Id.*

On March 30, 2016, Dr. Mains wrote a letter reaffirming his assessment as stated in his April 30, 2015 mental impairment questionnaire. *Id.* at 1011. Noting that his assessment "was based on the fact that Mr. Samuels resided in a highly structured supported living environment which reduced the severity of some of his symptoms," Dr. Mains stated that "Mr. Samuels's

symptoms and functional impairments would worsen if he were no longer living in a supported environment." *Id.* Dr. Mains opined that Mr. Samuels's mental health symptoms and functional limitations "persist even during periods of sobriety"; that his "mental impairments would still be disabling without drug/alcohol abuse"; and that his "psychiatric symptoms are independent of drug and alcohol use." *Id.*

### 2. Faith Tobias, Ph.D.

As noted above, Dr. Tobias is a psychologist and consultative examiner who, at the ALJ's request, saw Mr. Samuels for a psychological evaluation on June 22, 2016, following the first administrative hearing held on April 18, 2016. Dr. Tobias's report indicates that she reviewed three months of Mr. Samuels's medical records from Telecare CHANGES, dated December 23, 2015 through March 30, 2016. *Id.* at 1012. Other information available to Dr. Tobias came from a claimant history form, which Dr. Tobias notes was "completed in minimal fashion" by Mr. Samuels's brother. *Id.* Other information came from Mr. Samuels himself who, Dr. Tobias remarked, "did not appear to be the best historian or even his own best advocate." *Id.* at 1015. The report does not indicate how much time Dr. Tobias spent with Mr. Samuels.

Dr. Tobias noted Dr. Mains's diagnosis of schizoaffective disorder, as well as his observation that Mr. Samuels's mental impairments would persist even during periods of sobriety and would be disabling independent of any drug use. *Id.* at 1015. Based on her examination, Dr. Tobias questioned Dr. Mains's diagnosis, stating that the timeframe of Mr. Samuels's alleged onset of psychiatric symptoms (reported to be four or five years prior to her evaluation) was not suggestive of schizophrenia or schizoaffective disorder. She further noted that Mr. Samuels did not report a history of psychiatric treatment prior to the past three years and denied any history of psychiatric hospitalizations. *Id.* Dr. Tobias stated that it was "unclear to what extent the claimant has maintained sobriety" and that "to provide a more specific diagnosis and determine future levels of impairment, the claimant would need to undergo a sustained and verified period of substance abstinence. Only then could it be determined if he continues to experience psychiatric symptoms in the absence of substance use." *Id.*

Dr. Tobias observed that Mr. Samuels "did not appear to be fully forthright" in completing

10

the mental status examination and further noted that Mr. Samuels had a low energy level and "demonstrated mildly fluctuating attention and concentration," resulting in "slightly lowered effort" and "mildly lowered scores." *Id*. at 1013-15  Nevertheless, she stated that with encouragement, Mr. Samuels made adequate effort, such that his "test results are considered to be a reasonably valid measure of his current cognitive functioning." *Id*. at 1014.

Dr. Tobias's diagnostic impressions were as follows:  unspecified depressive and psychotic disorders, as well as crack cocaine and cannabis use.  *Id*. at 1015.  Based on Mr. Samuels's test results, she concluded that overall, Mr. Samuels's "clinical presentation and pattern of test performance suggest that his current cognitive functioning is likely to be within at least the borderline impaired to low average range," and that "this level of performance may underestimate his optimal cognitive ability."  *Id*.  She found that Mr. Samuels was mildly impaired in his ability to follow and remember complex, detailed instructions and that he had mild to moderate limitations in his ability to interact with co-workers, supervisors and the general public on a regular basis.  She further found that Mr. Samuels has moderate limitations in his ability to withstand the stress of a routine workday and to maintain emotional stability and predictability.  Dr. Tobias otherwise concluded that that the level of impairment on Mr. Samuels's work-related abilities were "None to Mild."  *Id*. at 1016.

### 3.    The ALJ's Assessment

As discussed above, in finding that Mr. Samuels has the RFC to perform light work, with certain limitations, the ALJ gave "little weight" to Dr. Mains's opinion and adopted Dr. Tobias's assessment "to the extent it is consistent with the above residual functional capacity finding based on the record as a whole for the reasons discussed herein."  AR 34.  Mr. Samuels argues that the ALJ failed to provide sufficient reasons, supported by substantial evidence, for discounting Dr. Mains's opinion.  He further contends that the ALJ ignored portions of Dr. Tobias's report in which she noted moderate restrictions on his work abilities.

"Cases in this circuit distinguish among the opinions of three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant

1   (nonexamining physicians)." *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1996). "As a general

2   rule, more weight should be given to the opinion of a treating source than to the opinion of doctors

3   who do not treat the claimant." *Id*.

4        A treating physician's opinion is entitled to "controlling weight" if it "is well-supported by

5   medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the

6   other substantial evidence" in the record. 20 C.F.R. § 416.927(c)(2).[8] "However, '[t]he ALJ need

7   not accept the opinion of any physician, including a treating physician, if that opinion is brief,

8   conclusory, and inadequately supported by clinical findings.'" *Bray v. Comm'r of Social Security*

9   *Admin.*, 554 F.3d 1219, 1228 (9th Cir. 2009) (quoting *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th

10  Cir. 2002)).

11       When an ALJ gives a treating physician's opinion less than controlling weight, the ALJ

12  must do two things. First, the ALJ must consider several factors, including "the length of the

13  treatment relationship and the frequency of examination, the nature and extent of the treatment

14  relationship, supportability, consistency with the record, and specialization of the physician."

15  *Trevizo v. Berryhill*, 871 F.3d 664, 675 (9th Cir. 2017);[9] *see also* 20 C.F.R. § 416.927(c).

16  Consideration must also be given to other factors, whether raised by the claimant or by others, or

17  if known to the ALJ, including the amount of relevant evidence supporting the opinion and the

18  quality of the explanation provided; the degree of understanding a physician has of the

19  Commissioner's disability programs and their evidentiary requirements; and the degree of his or

20  her familiarity with other information in the case record. 20 C.F.R. § 416.927(c)(6). The failure

21  to consider these factors, by itself, constitutes reversible error. *Trevizo*, 871 F.3d at 676.

22       Second, the ALJ must provide reasons for rejecting or discounting the treating physician's

23  opinion. The legal standard that applies to the ALJ's proffered reasons depends on whether or not

24

25  [8] Although the Commissioner's rules and regulations regarding the evaluation of medical evidence

26  were revised in 2017, there appears to be no dispute that those revisions do not apply to Mr. Samuels's claim for benefits, which was filed before those revisions went into effect.

27  [9] Although *Trevizo* concerned an application for disability insurance benefits under Title II of the

28  Social Security Act, in discussing the proper assessment of medical opinions, the *Trevizo* court addressed regulations that parallel those applicable to SSI applications.

the treating physician's opinion is contradicted by another physician. When a treating physician's opinion is not contradicted by another physician, the ALJ must provide "clear and convincing" reasons for rejecting or discounting the opinion, supported by substantial evidence. *Trevizo*, 871 F.3d at 675. When a treating physician's opinion is contradicted by another physician, an ALJ must provide "specific and legitimate reasons" for rejecting or discounting the treating physician's opinion, supported by substantial evidence. *Id.* "The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989) (quotations and citation omitted).

Dr. Mains's opinions about the nature and disabling effects of Mr. Samuels's mental impairments is contradicted by Dr. Tobias, who found that, for the most part, Mr. Samuels's ability to work was not limited, or only mildly limited, by his mental impairments. Thus, the ALJ was required to provide "specific and legitimate" reasons for discounting Dr. Mains's opinion, supported by substantial evidence. *Trevizo*, 871 F.3d at 675.

### a.  Dr. Mains's opinion

The ALJ gave Dr. Mains's opinion "little weight," finding that the record as a whole, including Mr. Samuels's medical history and Dr. Tobias's findings, "belie [Dr. Mains's] assessment" and that "[s]uch limitations for any twelve-month period are contradicted by the weight of the evidence of record" as discussed in his decision. *Id.* at 34-35. Additionally, the ALJ noted that "the medical records show generally adequate control of symptoms with medications and that the only highly structured living environment in which the claimant lived was during his rehabilitation program in 2014." *Id.* at 34.

The ALJ failed, in the first instance, to address all the factors he was required to consider under 20 C.F.R. § 416.927(c)(2)-(6). 20 C.F.R. § 416.927(c) ("Unless we give a treating source's medical opinion controlling weight under paragraph (c)(2) of this section, we consider *all* of the following factors in deciding the weight we give to any medical opinion.") (emphasis added). Although the ALJ apparently reviewed all of Mr. Samuels's treatment records and discussed the supportability of Dr. Mains's opinions, the ALJ did not discuss the length of the treatment

relationship, the frequency of examination, the nature and extent of the treatment relationship, or Dr. Mains's specialization. Instead, the ALJ stated, in conclusory fashion, that the record as a whole "belie[d]" Dr. Mains's assessment and that his opinions were "given little weight to the extent inconsistent with this finding based on the relevant factors and the weight of the evidence now of record." AR 34. As a result, it is unclear to what extent, if any, the ALJ considered those factors and how they informed the ALJ's decision to give Dr. Mains's opinion little weight. *Trevizo*, 871 F.3d at 676 (holding that the failure to address the relevant factors, alone, constitutes reversible error). The failure to adequately address all of the relevant factors is particularly notable, given that the ALJ rejected Dr. Mains's opinion in favor of those expressed by Dr. Tobias, who reviewed a few months of records from Telecare CHANGES and saw Mr. Samuels only once, and in favor of some findings of Dr. Morando, the agency non-examining psychiatrist, who never saw Mr. Samuels at all.

Moreover, the ALJ did not provide sufficiently specific and legitimate reasons, supported by substantial evidence, for discounting Dr. Mains's opinions. Mr. Samuels argues that insofar as Dr. Tobias relied on the same clinical findings as Dr. Mains, but simply reached different conclusions, her opinions are not substantial evidence. *See Orn v. Astrue*, 495 F.3d 625, 632 (9th Cir. 2007). In his cross-motion, the Commissioner says that Dr. Morando also found that Mr. Samuels had no significant limitation in certain areas of mental functioning, arguing that opinions of non-examining physicians may be substantial evidence if they are consistent with independent clinical findings or other evidence. *See Thomas*, 278 F.3d at 957. The ALJ ultimately did not agree with Dr. Morando's opinion regarding Mr. Samuels's RFC, which was less restrictive than the ALJ's evaluation; and the ALJ appeared to adopt Dr. Morando's findings only to the extent that they were consistent with the ALJ's RFC assessment. AR 35. As discussed below, such reasoning does not constitute proper evaluation of the evidence.

In any event, the particular issue presented here is whether the ALJ impermissibly disregarded certain evidence in discounting Dr. Mains's opinion. In dispute are the ALJ's findings that Dr. Mains's opinion was not consistent with medical records showing "generally adequate control of symptoms with medications" and "that the only highly structured living

environment in which [Mr. Samuels] lived was during his rehabilitation program in 2014." AR 34.

Some evidence does support the ALJ's conclusion that Mr. Samuels showed some improvement or abatement of his symptoms with medication.  In his decision, the ALJ cited records from November and December 2013 indicating that Mr. Samuels complained of depression and anxiety and presented with restricted affect and limited insight and judgment; that he was treated with medication; and that his medications were continued after Mr. Samuels reported that they were helping his symptoms.  *See, e.g.,* AR 33, 327, 329, 352, 366, 369, 376. The ALJ also cited treatment records from 2014, 2015 and 2016 observing that Mr. Samuels had a good mood and a congruent or appropriate affect; that his symptoms were controlled by medication; and that Mr. Samuels reported decreasing symptoms, such as previously-reported auditory hallucinations.  *See, e.g., id.* at 33-34, 465, 488-516, 496, 541, 603, 630, 647, 913, 917, 920, 934, 938, 945.  The ALJ also noted that in May 2014, Mr. Samuels successfully completed a 60-day residential substance abuse/mental health recovery program at Cronin House, observing that discharge records state that Mr. Samuels "completed most treatment goals, is stable on medication and is ready to step down to a lower level of care."  *Id.* at 33, 444.  While the ALJ acknowledged a reported increase in symptoms in November 2015, the same treatment record indicates that Mr. Samuels had not refilled his prescribed medications since April and had been without medication for about a month.  *Id.* at 34, 963.

The Commissioner cites to these and other treatment records, arguing that they demonstrate that Mr. Samuels's examinations were what the Commissioner characterizes as "unremarkable" and that his condition was stable or improved on medication.  *See, e.g., id.* at 33-34, 365, 368-369, 398-99, 481, 488-94, 497, 499, 502-03, 505-07, 509, 511-13, 515-16, 523, 525, 527, 530, 542, 558, 603-06, 630, 633, 644, 646-47, 666, 940, 945, 966-68, 970, 975, 977-78, 980, 982, 986, 1069.  Here, the Commissioner notes that after his heart attack, Mr. Samuels saw Dr. Mains in December 2014, but did not see him again until April 2015 when he ran out of medication, and again in November 2015 when he needed another medication refill.  Although the Commissioner acknowledges that Mr. Samuels subsequently had a crack cocaine relapse in 2016

15

and reported an increase in symptoms, Dr. Mains increased Mr. Samuels' Risperdal dosage and advised that good mental stabilization was unlikely if he continued to use cocaine. *Id*. at 940. By the following examination a week later, the Commissioner points out that Mr. Samuels was noted to have tolerated the increased Risperdal well and presented "mostly back at baseline, with all psychotic symptoms under good control." *Id*. at 939. Although Mr. Samuels continued to report auditory hallucinations, the Commissioner notes that treatment records in March, May and June 2016 indicate that his symptoms were controlled. *Id*. at 1069, 1076-77.

Considered in isolation, the evidence on which the ALJ relied suggests some improvement and stabilization. However, the ALJ was required to examine the medical evidence in the broader context of Mr. Samuels's impairments because "[r]eports of 'improvement' in the context of mental health issues must be interpreted with an understanding of the patient's overall well-being and the nature of [his] symptoms." *Garrison v. Colvin*, 759 F.3d 995, 1017 (9th Cir. 2014); *see also Holohan v. Massanari*, 246 F.3d 1195, 1205 (9th Cir. 2001) ("[A treating physician's] statements must be read in context of the overall diagnostic picture he draws. That a person who suffers from severe panic attacks, anxiety, and depression makes some improvement does not mean that the person's impairments no longer seriously affect [his] ability to function in a workplace.").

While Mr. Samuels seems to acknowledge that he experienced some stabilization with medication, he contends that treatment records, including records cited by the ALJ and the Commissioner, show that some of his psychotic symptoms persisted, and sometimes worsened, even with medication. Although Mr. Samuels notes that records showed he frequently presented with a blunted or restricted affect (*see, e.g.*, AR 365-366, 376, 517, 523, 1069), other records indicate that was Mr. Samuels's baseline (*see, e.g.,* AR 644). Nevertheless, Mr. Samuels notes that records indicate that he frequently also demonstrated concrete thought process, general disorganization and lack of motivation *See, e.g.,* AR 525, 527, 530, 567-68, 630, 633, 666, 669, 939, 963, 1078. Other treatment notes indicate that in 2016, Mr. Samuels continued to report having "bad" depression and isolating at home, hearing voices at night, and "that the medications still leave him with days where the voices he hears are very intense." *Id*. at 1069, 1072. While the

Cronin House discharge report states that Mr. Samuels completed most of his treatment goals, the report also indicates that those treatment goals did not concern the alleviation or stabilization of Mr. Samuels's symptoms, but instead addressed his ability to identify his symptoms and triggers, as well as coping skills. *Id*. at 444. Additionally, the report notes that although Cronin House staff recommended that Mr. Samuels extend his treatment there for an additional 30 days, Mr. Samuels declined. *Id*. Mr. Samuels also correctly notes that some of the 2013 records cited by the Commissioner indicating that he displayed intact memory, good attention and concentration also show that he reported feeling depressed three to four days per week, being irritable, and hearing voices. *See, e.g., id*. at 365, 368.

Moreover, the ALJ did not address observations by Dr. Mains and Mr. Samuels's case managers that Mr. Samuels had difficulty asking for help and seemed "deferential and obsequious to a fault," suggesting that he may have underreported the full extent of his symptoms. *See, e.g.,* AR 940; *see also* AR 493, 525, 530, 568. Indeed, even Dr. Tobias noted that Mr. Samuels was not "the best historian or even his own best advocate." *Id*. at 1015. Although the Commissioner argues that Mr. Samuels ultimately bears the burden of establishing that his symptoms (underreported or not) are disabling, that does not relieve the ALJ of his obligation to consider the broader context of Mr. Samuels's impairments. *Garrison*, 759 F.3d at 1017.

Further, reports of improvement in the context of mental health issues "must also be interpreted with an awareness that improved functioning while being treated and while limiting environmental stressors does not always mean that a claimant can function effectively in a workplace." *Garrison*, 759 F.3d at 1017. Social Security regulations require the Commissioner to evaluate the capacity of mentally impaired claimants to function in an unstructured setting:

> F. Effects of structured settings. Particularly in cases involving chronic mental disorders, overt symptomatology may be controlled or attenuated by psychosocial factors such as placement in a hospital, halfway house, board and care facility, or other environment that provides similar structure. Highly structured and supportive settings may also be found in your home. Such settings may greatly reduce the mental demands placed on you. With lowered mental demands, overt symptoms and signs of the underlying mental disorder may be minimized. At the same time, however, your ability to function outside of such a structured or supportive setting may not have changed. If your symptomatology is controlled or attenuated by

psychosocial factors, we must consider your ability to function outside of such highly structured settings. . ..

20 C.F.R. Pt. 404, Subpt. P, App. 1 12.00(F).[10]

As noted, the ALJ discounted Dr. Mains's opinion, noting that "that the only highly structured living environment in which the claimant lived was during his rehabilitation program in 2014." AR 34. The ALJ appropriately considered the time Mr. Samuels spent in the recovery program at Cronin House and also noted that Mr. Samuels also lived with his mother and other relatives. AR 31, 34. Nevertheless, Mr. Samuels argues, persuasively, that the ALJ failed to consider the full context of the support he received from treatment services and from his family. For example, after being discharged from Cronin House, Mr. Samuels moved to housing in a sober living environment ("SLE"), where he lived from May 2014 through late 2015. *Id*. at 527, 646, 940, 942. Before entering the program at Cronin House and after the SLE closed, Mr. Samuels lived primarily with his mother, who checked on him when he isolated in his room and who otherwise provided significant support with food and shopping, reminders to take medication as well as reminders regarding personal care and grooming. *Id*. at 48-49, 52, 55, 365, 942, 1013. Meanwhile, Mr. Samuels also continued to receive services at Telecare CHANGES, where he generally met with his case manager on a weekly basis. *See, e.g.*, AR 488, 512, 542, 644, 1002. Although the Court finds it unnecessary to decide whether the SLE and family support Mr. Samuels received constitute "highly structured and supportive settings" within the meaning of applicable regulations, the Court agrees with Mr. Samuels that in discrediting Dr. Mains's opinion, the ALJ took an unreasonably narrow view of the support structure that Mr. Samuels actually had during periods when at least some of his symptoms improved, and did not consider how the absence of such structure and support might impact Mr. Samuels ability to function. As noted above, Dr. Mains deemed continuing support to be an important component of Mr. Samuels's successful treatment. *Id*. at 673, 1011.

For these reasons, the ALJ did not provide sufficient reasons, supported by substantial evidence in discounting Dr. Mains's opinion. On this particular issue, Mr. Samuels's motion for

---

[10] The Court cites to the version of the regulation in effect through September 28, 2016.

summary judgment is granted, and the Commissioner's cross-motion is denied.

### b. Dr. Tobias's opinion

Mr. Samuels contends that the ALJ erred by failing to address or to incorporate into his RFC determination Dr. Tobias's findings that Mr. Samuels has moderate limitations on his ability to withstand the stress of a routine workday and to maintain emotional stability and predictability. The Commissioner does not dispute Mr. Samuels's assertion that insofar as the ALJ rejected these findings, he was required to provide a specific and legitimate reason for doing so.

Mr. Samuels argues that the ALJ failed to provide any reason at all. The Commissioner claims that the ALJ did address Dr. Tobias's findings. Indeed, the ALJ noted that Dr. Tobias "assessed . . . moderate limitations with respect to maintaining work." *Id*. at 34. As noted above, the ALJ "adopted" Dr. Tobias's assessment "to the extent that it is consistent with the above residual functional capacity finding based on the record as a whole for the reasons discussed herein." *Id*. This reasoning is boilerplate and obfuscates the extent to which the ALJ either adopted or rejected Dr. Tobias's findings. No other explanation is given in this portion of the ALJ's decision as to whether and to what extent he may have considered Dr. Tobias's findings of moderate limitations to be consistent with his RFC determination.

The Commissioner insists that the ALJ did not reject those findings and that he explained why. Here, the Commissioner directs the Court to a statement earlier in the ALJ's decision, at step three of the sequential analysis:

> The finding of even moderate restrictions or difficulties in general is not intended to constitute a finding of an inability to sustain at least simple, routine tasks consistent with unskilled jobs requiring a specific vocational preparation (SVP) of 2 or the limited interaction required of most such jobs within the residual functional capacity in this case.

*Id*. at 31. Mr. Samuels notes that this statement appears to pertain to an entirely different and unrelated portion of the ALJ's analysis. Indeed, the ALJ appears to be referring here to his own conclusions and findings required at step three of the sequential analysis.

On this issue, Mr. Samuels's motion for summary judgment is granted, and the

Commissioner's cross-motion is denied.

### C.    The ALJ's Credibility Determination

As noted above, Mr. Samuels testified at both administrative hearings.  He also completed a function report and submitted one from his mother, Leatta Poston.  The ALJ did not make a finding of malingering and concluded that Mr. Samuels's medically determinable impairments could reasonably be expected to cause the type of symptoms alleged, but that his statements concerning the intensity, persistence and limiting effects of his symptoms "are found not consistent with the medical evidence and other evidence in the record to the extent inconsistent with the residual functional capacity finding for the reasons explained in this decision." *Id*. at 32. The ALJ similarly discounted Ms. Poston's statements regarding Mr. Samuels's impairments "[t]o the extent that the statements essentially constitute a reiteration of the claimant's subjective allegations . . .." AR 35.  Mr. Samuels argues that the ALJ used impermissible boilerplate language and did not provide sufficient reasons to support his credibility determinations.  In challenging the ALJ's findings, Mr. Samuels focuses primarily on his mental impairments.

### 1.    Mr. Samuels

Mr. Samuels testified that, even with medication, he experiences auditory hallucinations and feelings of paranoia, and has anxiety attacks at least three times per week.  He further testified that he currently lives with his mother, who takes care of food and shopping and reminds Mr. Samuels to eat, get dressed, take his medications and wash his clothes.  On a given day, Mr. Samuels says he usually walks and "isolate[s] [him]self, sit[s] somewhere by [him]self," and that his "basic day" involves shutting himself in his room and laying down.  When he does go outside, he says he tries to get as far away from people as possible and gets upset if he is approached by strangers.  If he takes public transportation, he likes to sit where his back is to the wall and he can see everything in front of him; and, he sometimes will not take public transportation if there are too many people around.  Mr. Samuels further testified to difficulties falling asleep, stating that sometimes his medications do not work.  He also claims difficulties with concentration. Additionally, Mr. Samuels noted chest pains caused by too much exertion, as well as problems with shortness of breath, stating that he can walk for two blocks before needing to rest for about

20

10 minutes, and can stand for 10 to 20 minutes before needing to sit down. AR 48, 49, 50-57, 236-245.

An ALJ conducts a two-step analysis in assessing subjective testimony. First, "the claimant 'must produce objective medical evidence of an underlying impairment' or impairments that could reasonably be expected to produce some degree of symptom." *Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008) (*quoting Smolen v. Chater*, 80 F.3d 1273, 1281-82 (9th Cir. 1996)). If the claimant does so, and there is no affirmative evidence of malingering, then the ALJ can reject the claimant's testimony as to the severity of the symptoms "'only by offering specific, clear and convincing reasons for doing so.'" *Id.* (*quoting Smolen*, 80 F.3d at 1283-84). That is, the ALJ must "make 'a credibility determination with findings sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony.'" *Id.* (*quoting Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002)). "This is not an easy requirement to meet: The clear and convincing standard is the most demanding required in Social Security cases." *Trevizo*, 871 F.3d at 678 (quotations and citation omitted).

An ALJ may consider several factors, including (1) ordinary techniques of credibility evaluation; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities. *Tommasetti*, 533 F.3d at 1039. Additionally, an ALJ may also consider the observations of treating and examining physicians and other third parties concerning the nature, onset, duration, and frequency of the claimant's symptoms; precipitating and aggravating factors; and functional restrictions caused by the symptoms. *Smolen*, 80 F.3d at 1284. "Although lack of medical evidence cannot form the sole basis for discounting pain testimony, it is a factor that the ALJ can consider in his credibility analysis." *Burch*, 400 F.3d at 681. "If the ALJ's finding is supported by substantial evidence, the court 'may not engage in second-guessing.'" *Tommasetti*, 533 F.3d at 1039 (*quoting Thomas*, 278 F.3d at 959).

Here, the ALJ made no finding of malingering and therefore was required to provide specific, clear and convincing reasons for discounting Mr. Samuels's statement regarding his symptoms. *Tommasetti*, 533 F.3d at 1039.

The ALJ erred insofar as he rejected Mr. Samuels's statements "to the extent inconsistent with the residual functional capacity finding for the reasons explained in this decision." AR 32. The Ninth Circuit has held that substantially identical language constitutes an impermissible boilerplate statement that "should not be used in disability decisions" because it "encourages an inaccurate assessment of a claimant's credibility and also permits determination of RFCs that are inconsistent with truly credible testimony." *Laborin v. Berryhill*, 867 F.3d 1151, 1152-53 (9th Cir. 2017); *see also Revels v. Berryhill*, 874 F.3d 648, 666 (9th Cir. 2017) ("[t]o determine the RFC *first* and *then* assess the claimant's testimony is to put the cart before the horse") (internal quotations and citation omitted).

The ALJ went on to explain that he found Mr. Samuels's reported activities to be "inconsistent with greater functional capacity limitations":

> I note, *inter alia*, that, despite reported shortness of breath on a daily basis and pain while standing, the claimant repeatedly reported that one of his primary activities was going for walks (Exs. 6F/29; 9F/27; 19F/2). As discussed, imaging detailed only mild scarring, and the claimant was advised to quit smoking because of his emphysema (Exs. 1F/5; 5F/2; 16F/3). Despite his recognized cardiac impairment, records consistently showed an essentially normal ejection fraction and that the condition has been treated conservatively with medication (Ex. 20F/10, 32). Despite reporting problems with crowds of people, the claimant used the bus to travel (Ex. 8F/56). As discussed, he frequently was observed to have a good mood, particularly after rehabilitation from substance abuse disorders, (Exs. 8F/42-70, 15F/9), and often reported that his mental health symptoms had improved or were better controlled through the use of medication (Exs. 8F/50, 10F/62). The record as a whole and the relevant factors support this finding.

AR 35-36. The Court agrees that the ALJ's proffered reasons fail to satisfy the standard for properly discrediting Mr. Samuels's testimony and reports. In focusing on observations in treatment records of Mr. Samuels's "good mood," for the reasons discussed above, the ALJ took an unreasonably narrow view of Mr. Samuels's overall well-being and diagnosis, as well as the nature of his symptoms, and did not appear to consider other observations in Mr. Samuels's treating records about his difficulty in expressing the full extent of his symptoms, or the structure and support Mr. Samuels received that may have limited stressors.

Relatedly, Mr. Samuels also takes issue with the ALJ's findings, stated elsewhere in his

1    decision, that Mr. Samuels's mental health symptoms were treated "conservatively" with

2    medication. AR 34. "Any evaluation of the aggressiveness of a treatment regimen must take into

3    account the condition being treated." *Revels*, 874 F.3d at 667. Here, the record indicates that Mr.

4    Samuels took various combinations of the prescribed medications Risperdal, Vistaril, Sertraline,

5    Prazosin and Benadryl. *See, e.g.,* AR 327, 365-66, 391, 666. The ALJ provided no explanation

6    why he considered Mr. Samuels's treatment with psychiatric medications "conservative" for Mr.

7    Samuels's mental health impairments.

8        Further, although Mr. Samuels testified that he takes daily walks and sometimes also uses

9    public transportation, merely because a disability plaintiff carries on certain daily activities "does

10   not in any way detract from [his] credibility as to [his] overall disability." *Orn*, 495 F.3d at 639

11   (citation omitted). "The ALJ must make 'specific findings relating to [the daily] activities' and

12   their transferability to conclude that a claimant's daily activities warrant an adverse credibility

13   determination." *Id*. (quoting *Burch v. Barnhart*, 400 F.3d 676, 681 (9th Cir. 2005)). In the present

14   matter, the ALJ did not discuss whether the identified activities are transferable to a work setting,

15   or cite any evidence that Mr. Samuels spent a substantial part of his day engaged in transferable

16   skills. For example, records indicate that taking walks is one way in which Mr. Samuels tries to

17   cope with his auditory hallucinations and other symptoms. *See, e.g.,* AR 481, 558, 954, 978.

18   Additionally, it is not apparent that the ALJ addressed Mr. Samuels's testimony that when he uses

19   public transportation, he tries to sit in a seat where his back is to the wall and he can see

20   everything in front of him and that he has sometimes not used public transportation if there were

21   too many people around. Accordingly, the mere fact that Mr. Samuels carried on these activities

22   does not constitute substantial evidence to support the ALJ's decision to discount his statements as

23   to the severity of his symptoms.

24       The Commissioner argues that while Mr. Samuels reported having difficulties being

25   around crowds of people, he would spend days "hanging out" downtown. AR 502, 503, 507. This

26   was not a reason cited by the ALJ and cannot properly be considered here. *Orn*, 495 F.3d at 630

27   (stating that the court "review[s] only the reasons provided by the ALJ in the disability

28   determination and may not affirm the ALJ on a ground upon which he did not rely."). In any

event, the Commissioner cites no evidence that Mr. Samuels was spending time with or around

others.

On this issue, Mr. Samuels's motion for summary judgment is granted, and the

Commissioner's cross-motion is denied.

### 2.    Ms. Poston

Ms. Poston completed a third-party report and a subsequent statement addressing many of

the same issues regarding Mr. Samuels's functional limitations, noting for example, that Mr.

Samuels lived with her (or other relatives or friends); that she has to remind him to eat and about

personal care and grooming matters; and that Mr. Samuels walks and uses public transportation.

AR 228-236, 284-285.  The ALJ discounted Ms. Poston's statements for the same reasons he

partially discredited Mr. Samuels's allegations regarding his impairments:

> [Ms. Poston's] statements are found to be consistent with the record
> as a whole only to the extent consistent with the residual functional
> capacity finding based on the relevant factors and the record for the
> reasons explained in this decision.  To the extent that the statements
> essentially constitute a reiteration of the claimant's subjective
> allegations, they are found consistent with the record only to the same
> extent as those allegations for the same reasons . . ..

AR 35.  To reject a third-party report of a claimant's impairments, an ALJ must "give reasons that

are germane to each witness."  *Revels*, 874 F.3d at 655 (internal quotations and citations omitted).

As discussed above, the ALJ's reasons for rejecting Mr. Samuels's statements were erroneous and

do not constitute either "clear and convincing" evidence for rejecting his testimony or "germane"

reasons for rejecting Ms. Poston's statements.  *See id.* at 668 (concluding that the ALJ's reasons

for rejecting the claimant's testimony were also not "germane" reasons for rejecting the third-party

reports submitted by her parents).

On this issue, Mr. Samuels's motion for summary judgment is granted, and the

Commissioner's cross-motion is denied.

### D.    The ALJ's RFC Assessment and Analysis at Step Five

As a result of the identified errors in the ALJ's consideration of the opinions of Drs. Mains

and Tobias, Mr. Samuels argues that the ALJ's RFC assessment fails to account for all of his

limitations and therefore is not supported by substantial evidence.  For the reasons discussed

24

1     above, the Court agrees. *See generally Valentine v. Comm'r of Social Security*, 574 F.3d 685, 690

2     (9th Cir. 2009) ("Thus, an RFC that fails to take into account a claimant's limitations is

3     defective."); *see also Hill v. Astrue*, 698 F.3d 1153, 1161 (9th Cir. 2012) (concluding that the ALJ

4     provided an incomplete RFC determination where significant probative evidence was improperly

5     discounted or ignored).

6          Relatedly, Mr. Samuels argues that the ALJ's erroneous RFC assessment led to the ALJ's

7     alleged improper reliance on the grids at step five of the sequential analysis. Mr. Samuels argues

8     that the grids are inapplicable and that the ALJ was instead required to obtain VE testimony.

9          The Commissioner contends that Mr. Samuels waived any argument about improper

10    reliance on the grids because he failed to raise the issue in his administrative proceedings. While

11    the Ninth Circuit held in *Meanel v. Apfel*, 172 F.3d 1111, 1115 (9th Cir. 1999), that claimants

12    "must raise issues at their administrative hearings in order to preserve them on appeal," it has also

13    noted that where an argument raised for the first time on appeal is a pure question of law and the

14    Commissioner would not be unfairly prejudiced by the plaintiff's failure to raise the issue below,

15    it may nevertheless be considered by the court," *Silveira v. Apfel*, 204 F.3d 1257, 1260 n.8 (9th

16    Cir. 2000). Here, Mr. Samuels complains of a legal error that the ALJ made at step five of the

17    sequential analysis that became apparent only when the ALJ issued his written decision. Under

18    these circumstances, the Court declines to find a waiver. *See, e.g., Razzari v. Berryhill*, No. 16-cv-

19    02945-JCS, 2017 WL 6539790, at *4-5 (N.D. Cal. Dec. 21, 2017) (finding no waiver where the

20    claimant raised a legal error that became apparent only when the ALJ issued his written decision);

21    *Brown v. Berryhill*, No. 16-cv-04022-EMC, 2017 WL 4417516, at *15 n.2 (N.D. Cal. Oct. 4,

22    2017) (same).

23         Turning to the merits of Mr. Samuels's arguments, he contends that because the ALJ

24    concluded that he has both exertional and non-exertional functional limitations, the ALJ was

25    required to obtain VE testimony, and erred in relying on the grids in determining that he is not

26    disabled. At step five of the sequential analysis, the Commissioner bears the burden to

27    demonstrate that there are a significant number of jobs in the national economy that the claimant

28    could perform. *Tackett v. Apfel*, 180 F.3d 1094, 1100 (9th Cir. 1999). The Commissioner can

meet that burden in two ways: (1) through VE testimony or (2) by applying the grids, which "present, in *table form*, a short-hand method for determining the availability and numbers of suitable jobs for a claimant." *Id*. at 1100-01.

"The grids are an administrative tool the Secretary may rely on when considering claimants with substantially uniform levels of impairment," *Burkhart v. Bowen*, 856 F.2d 1335, 1340 (9th Cir. 1988), but they may only be used "where they *completely and accurately* represent a claimant's limitations," *Tackett*, 180 F.3d at 1101. The fact that a non-exertional limitation is alleged does not automatically preclude use of the grids. *Tackett*, 180 F.3d at 1102. "The ALJ should first determine if a claimant's non-exertional limitations significantly limit the range of work permitted by his exertional limitations." *Id*. "When a claimant's non-exertional limitations are 'sufficiently severe' so as to significantly limit the range of work permitted by the claimant's exertional limitations, the grids are inapplicable." *Burkhart*, 856 F.2d at 1340 (citing *Desrosiers*, 846 F.2d at 577); *see also Lounsbury v. Barnhart*, 468 F.3d 1111, 1115 (9th Cir. 2006) (stating that where a claimant suffers from both sufficiently severe exertional and non-exertional limitations, the ALJ must consult the grids first and—if the grids do not classify the claimant as disabled—rely on other evidence to separately examine the non-exertional limitations).

As discussed above, the ALJ concluded that Mr. Samuels has the ability to perform light work, with the additional limitations that he needs to avoid concentrated exposure to respiratory irritants and is restricted to simple routine tasks equating to unskilled work. AR 36. The ALJ concluded that the identified non-exertional limitations would have no significant impact on the occupational base of unskilled light work and that a finding of "not disabled" therefore was appropriate under the grids. *Id*. Mr. Samuels does not appear to challenge the ALJ's finding that he is exertionally limited to light work. Nor does he seem to challenge the ALJ's findings as to the non-exertional limitations the ALJ identified. Rather, Mr. Samuels contends that the ALJ should have considered additional non-exertional limitations of moderate and marked limitations on his mental RFC noted by Drs. Mains and Tobias. Insofar as the Court agrees that the ALJ failed to properly account for those additional limitations in his RFC determination, on remand the ALJ may be required to obtain testimony from a VE in determining whether Mr. Samuels is

disabled.

The Commissioner's reliance on *Hoopai v. Astrue*, 499 F.3d 1071 (9th Cir. 2007) is misplaced. In *Hoopai*, the ALJ found, at step two of the sequential analysis, that the claimant had severe depression, but did not find that the depression resulted in significant limitations that needed to be included in his RFC finding and presented to a vocational expert at step five. Holding that "[t]he step two and step five determinations require different levels of severity of limitations such that the satisfaction of the requirements at step two does not automatically lead to the conclusion that the claimant has satisfied the requirements at step five," the Ninth Circuit affirmed the ALJ's determination that the claimant's depression did not constitute a sufficiently severe non-exertional limitation requiring vocational testimony at step five of the sequential analysis.. *Id*. at 1076. Here, unlike in *Hoopai*, both Drs. Mains and Tobias assessed moderate or marked limitations on Mr. Samuels's functional abilities that the ALJ, without proper explanation, disregarded. Thus, *Hoopai* is inapposite.

On this issue, Mr. Samuels's motion for summary judgment is granted, and the Commissioner's cross-motion is denied.

## V.    DISPOSITION

"When the ALJ denies benefits and the court finds error, the court ordinarily must remand to the agency for further proceedings before directing an award of benefits." *Leon v. Berryhill*, 880 F.3d 1041, 1045 (9th Cir. 2017) (citing *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1099 (9th Cir. 2014)). That is because "an ALJ's failure to provide sufficiently specific reasons for rejecting the testimony of a claimant or other witness does not, without more, require the reviewing court to credit the testimony as true." *Treichler*, 775 F.3d at 1106.

The Court may order an immediate award of benefits only if three conditions are met. First, the Court asks "whether the 'ALJ failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion.'" *Id.* (quoting *Garrison v. Colvin*, 759 F.3d 995, 1020 (9th Cir. 2014)). Next, the Court "determine[s] 'whether there are outstanding issues that must be resolved before a determination of disability can be made . . . . and whether further administrative proceedings would be useful.'" *Id*. (quoting *Treichler*, 775 F.3d at 1101).

27

"When these first two conditions are satisfied, [the Court] then credit[s] the discredited testimony as true for the purpose of determining whether, on the record taken as a whole, there is no doubt as to disability." *Id*. (citing *Treichler*, 775 F.3d at 1101). Even when all three conditions are satisfied and the evidence in question is credited as true, it is within the district court's discretion whether to make a direct award of benefits or to remand for further proceedings when the record as a whole creates serious doubt as to disability. *Id*. at 1045. As explained by the Ninth Circuit, "[a]n automatic award of benefits in a disability benefits case is a rare and prophylactic exception to the well-established ordinary remand rule." *Id*. at 1044.

In the present case, the first condition is met because the Court has found that the ALJ failed to provide legally sufficient reasons for giving little weight to Dr. Mains's opinion and for apparently rejecting portions of Dr. Tobias's assessment, as well as in discounting testimony and statements of Mr. Samuels and Ms. Poston. However, because the ALJ did not fully or properly evaluate the opinions of Drs. Mains and Tobias, or properly consider Mr. Samuels's testimony and reports by Ms. Poston, there remain outstanding issues to be resolved, including the ALJ's determinations regarding Mr. Samuels's RFC and his ability to work. *See, e.g., Salaz v. Colvin*, 650 Fed. App'x 926 (9th Cir. 2016) (vacating the ALJ's RFC determination and remanding for further proceedings where the ALJ failed to give legally sufficient reasons for rejecting aspects of the claimant's treating physicians' opinions and for finding the claimant not fully credible); *Asmar v. Colvin*, No. 16-cv-01079-GPC-MDD, 2017 WL 3405688, at *11 (S.D. Cal., Aug. 9, 2017) (remanding for further proceedings where the ALJ did not properly assess the treating physicians' opinions and, thus, issues concerning the plaintiff's RFC and ability to work remained in the case); *Murphy v. Colvin*, No. 14-cv-03784-YGR, 2015 WL 6674815, at *13-14 (N.D. Cal., Nov. 2, 2015) (same). Accordingly, the Court will remand this matter for further proceedings.

## VI.     CONCLUSION

Based on the foregoing, Mr. Samuels's motion for summary judgment is granted in part and denied in part, the Commissioner's cross-motion for summary judgment is granted in part and denied in part, and this matter is remanded for further proceedings consistent with this order. The

Clerk shall enter judgment accordingly and close this file.

**IT IS SO ORDERED.**

Dated:   September 18, 2019

VIRGINIA K. DEMARCHI
United States Magistrate Judge